UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TAMARA G. NELSON and TIMOTHEA RICHARDSON, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BELINDA C. CONSTANT, et al.,<br><br>Defendants. | Case No. 17-cv-14581-JVM<br><br>Division 1: Magistrate van Meerveld<br><br>(Class Action) |

## **PLAINTIFFS' POST-ARGUMENT BRIEF**

At oral argument on Plaintiffs' Motion for Partial Summary Judgment on January 24, 2020, the Court posed several factual questions to Plaintiffs' counsel that they were unable to fully answer during the hearing. At that time, Plaintiffs' counsel informed the Court that they would provide those answers in a written submission. Plaintiffs provide those answers with relevant citation in the paragraphs that follow.

During a discussion of *Harjo v. City of Albuquerque*, 326 F. Supp. 3d 1145 (D.N.M. 2018), the Court inquired into the amount of money that created a conflict for Albuquerque's asset forfeiture program. The city created, through municipal ordinance, an asset forfeiture program in which vehicles that were operated in the commission of DWIs and certain other felonies could be seized and forfeited. The program operated through a subdivision of the police department, the "DWI Seizure Unit" that was staffed by police officers and civilian employees. *Id.* at 1152. Two attorneys from the city attorney's office were also assigned to work with this department. *Id.* The funds generated by the asset forfeiture program were used to pay operating costs and salaries of employees in the DWI Seizure Unit, including salaries of the city attorneys

prosecuting these forfeiture cases. *Id*. at 1157. Revenue in excess of the program's costs was used for "discretionary purchases" such as a new building for the police department, police vehicles, and other equipment. *Id.* at 1157–58. From 2009–2016, the program generated total revenue of $11.8 million, and revenue exceeded costs in four of those years. *Id.* at 1156–57.

In *Harjo*, the trial court did not consider the revenue of the asset forfeiture program as a percentage of the city's budget. Instead, the court analyzed the revenue of the asset forfeiture program as a percentage of the program's operating expenses. The court found that there was an institutional conflict of interest violating due process because "there is a realistic possibility that the forfeiture program prosecutors' judgment will be distorted, because in effect, the more revenues the prosecutor raises, the more money the forfeiture program can spend." *Id.* at 1195.

While discussing and distinguishing *Dugan v. Ohio*, 277 U.S. 61 (1928), Plaintiffs' counsel referenced, without citation, the Ohio Supreme Court's opinion for the proposition that the Court did not have before it the amount of revenue collected by the City of Xenia's mayor's court or its percentage of the budget. The relevant citation is *Dugan v. State*, 159 N.E. 477, 477 (Ohio 1927) ("It does not appear in this record that the court of the mayor of city of Xenia has any of the features referred to in the opinion of the United States Supreme Court in the *Tumey* case, whereby the cause of justice was commercialized, and it further appears that the offense for which Dugan was tried was committed within the limits of the city of Xenia. **The amount of fines collected annually on convictions before the mayor of Xenia in liquor cases does not appear**.") (emphasis added).

While distinguishing *Dugan* from the city-wide institutional conflicts seen in *Tumey* and *Ward*, Plaintiffs' counsel also referred to the state of Ohio's briefing in the Supreme Court for the proposition that, unlike the village in *Tumey*, the city of Xenia had not passed municipal

2

ordinances divvying up the liquor court revenues among police officers and city prosecutors. The relevant passages can be found on page 10 of the state of Ohio's brief. Brief of Def. in Error at 10, *Dugan v. Ohio*, No. 766 (Judd & Detweiler Printers 1928).[1]

The Court inquired as to the amount of conflicted funds at issue in *Caliste v. Cantrell*, 2:17-cv-6197 (E.D. La). Plaintiffs' counsel misspoke when stating that the total annual amount of bail fees collected was around $2 million dollars. While Plaintiffs' counsel was accurate in representing to the Court that the bail fee accounted for up to 25% of the Orleans Parish Criminal District Court's judicial expense fund, the amount of the bail fee collected annually ranged from $800,000 to $1 million for the years in question.[2] The $2 million referenced by Plaintiffs' Counsel is instead the total amount of the bail fees at issue in *Caliste* and the post-conviction fines and fees at issue in *Cain*.[3] Plaintiffs' counsel apologize for any confusion caused by their mistake.

Lastly, the Court asked about the absence of audited financial data for fiscal year 2012–13 in the table Plaintiffs included on page 5 of their *Statement of Uncontested Material Facts* (ECF No. 112-2). Plaintiffs responded that the City's Operating Budget containing the audited figures for that year had not been available to them. Although no longer available on Gretna's website, Plaintiffs recently obtained a cached version of Gretna's Operating Budget for 2014–15,[4] which contains the audited figures for FY 2012–13 that had been missing from Plaintiffs'

---

[1] Plaintiffs attach the brief in its entirety as Ex. 1, as the brief does not seem to be readily available on most electronic services.

[2] Plaintiffs attach as Ex. 2 the relevant portion of the plaintiffs' statement of uncontested material facts, as adopted by defendant Cantrell, in *Caliste v. Cantrell*, No. 2:17-cv-6197, ECF No. 119-4 at 9 (E.D. La. filed June 26, 2018).

[3] Order and Reasons, *Cain v. City of New Orleans*, No. 15-cv-4479, ECF No. 279 at 6–7 (E.D. La. filed Dec. 13, 2017) ("From 2012 through 2015, the Judicial Expense Fund's annual revenue was approximately $4,000,000. Roughly half of this revenue came from other governmental entities, especially the City of New Orleans. About $1,000,000 came from bail bond fees, and another $1,000,000 from fines and other fees.")

[4] Attached as Ex. 3 and available at: https://web.archive.org/web/20150918225559/http://www.gretnala.com/egov/documents/1396543823_00501.pdf, last accessed on Feb. 12, 2020.

*Statement of Uncontested Material Facts.* Plaintiffs reproduce the table with the relevant FY 2012-13 figures highlighted, below:

| Fiscal Year | 2017–18 | 2016–17 | 2015–16 | 2014–15 | 2013–14 | 2012-2013 | 2011–12 |
|---|---|---|---|---|---|---|---|
| Mayor's Court Conviction Revenue[5] | $1,076,422 | $1,284,131 | $1,587,786 | $1,663,545 | $1,732,179 | $1,493,714 | $1,686,337 |
| Deferred Prosecution Revenue | $542,644 | $635,276 | $736,044 | $785,776 | $388,296 | $444,444 | $457,648 |
| Total General Fund Revenue | $16,797,495 | $17,502,366 | $22,026,500 | $18,000,996 | $18,177,296 | $18,031,464 | $17,295,304 |
| Mayor's Court Conviction Revenue as % of General Fund | 6.4% | 7.3% | 7.2% | 9.2% | 9.5% | 8.28% | 9.8% |
| Deferred Prosecution Revenue as % of General Fund | 3.2% | 3.6% | 3.3% | 4.4% | 2.1% | 2.46% | 2.6% |
| Conviction Revenue + Deferred Prosecution Revenue as % of General Fund | 9.6% | 10.9% | 10.6% | 13.6% | 11.7% | 10.75% | 12.4% |

---

[5] Sum of the Operating Budgets' revenue line items for "Non-Moving Traffic Fines," "Moving Traffic Fines," "City Court Costs," and "Criminal Fines."

4

Respectfully submitted,

*/s/ Eric A. Foley*
ERIC A. FOLEY, La. Bar No. 34199, T.A.
JAMES W. CRAIG, La. Bar No. 33687
ELIZABETH CUMMING, La. Bar. No. 31685
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
eric.foley@macarthurjustice.org
jim.craig@macarthurjustice.org
elizabeth.cumming@macarthurjustice.org