UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TAMARA G. NELSON, ET AL., | * | CIVIL ACTION |
| *Plaintiffs* | * | NO. 17-14581 |
| | * | |
| VERSUS | * | DIVISION: 1 |
| | * | |
| BELINDA C. CONSTANT, ET AL. | * | MAGISTRATE JUDGE |
| *Defendants* | * | JANIS VAN MEERVELD |
| | * | |
| | * | |

<u>ORDER AND REASONS</u>

Before the Court is the plaintiffs' Motion for Partial Summary Judgment (Rec. Doc. 112) and the defendants' Motion for Summary Judgment. (Rec. Doc. 77). The material facts are undisputed. Because the court finds there is no institutional financial conflict of interest in the operation of the Mayor's Court of the City of Gretna, plaintiffs' Motion for Partial Summary Judgment is DENIED and defendants' Motion for Summary Judgment is GRANTED as to plaintiffs' due process claims and DENIED as to defendants' immunities arguments. Plaintiffs' Count I claim alleging a financial conflict of interest in the Mayor's Court in violation of Due Process is hereby dismissed with prejudice.

<u>Background</u>

Plaintiffs filed this lawsuit to correct what they describe as egregious Due Process and Equal Protection violations occurring at the Mayor's Court of the City of Gretna. They allege that the Mayor's Court, which is appointed by the City Council and serves at the pleasure of the Mayor, is incentivized to maximize arrests and multiply prosecutions to generate fines and fees that fund the City of Gretna. They say a disproportionate number of arrests are of African Americans. Plaintiffs also challenge the Deferred Prosecution Program, which offers arrestees accused of

violating a municipal ordinance the opportunity to have their charges dismissed in exchange for an agreement to pay a fine that is typically less than the fine upon a finding of guilt but does not offer an alternative for those who cannot pay the program's fees. Plaintiffs' complaint seeks to certify two classes. Proposed Class A consists of persons cited to appear before the Mayor's Court who are awaiting adjudication of their criminal or traffic cases (represented by plaintiff Tamara Nelson). Proposed Class B consists of persons who in the past year were denied participation in, terminated from, or threatened with termination from the Deferred Prosecution program due to their inability to pay program fees (represented by plaintiff Timothea Richardson). The claims are similarly divided into two counts. Count I is a Due Process challenge to the alleged financial conflict of interest in the Mayor's Court. Count II is an Equal Protection and Due Process challenge to the Deferred Prosecution Program. No class has yet been certified. In August 2019, the parties reported that Count II had been settled and that they planned to file a motion to certify a settlement class and to approve the settlement. That motion has not yet been filed, and accordingly, Count II remains live.

This case was originally allotted to a district judge. In May 2019, the parties consented to proceed before the magistrate judge and the matter was referred on May 7, 2019. Trial is currently set to begin on March 23, 2020.

There are two motions presently before the Court. The first is the plaintiffs' Motion for Partial Summary Judgment on Count I. (Rec. Doc. 112). They assert that the amount of revenue generated by the Mayor's Court paired with the Mayor's ultimate control over the prosecution and adjudication of the offenses results in an impermissible conflict of interest. The defendants oppose, arguing that the Magistrates for the Mayor's Court are disinterested and impartial judges with no financial interest in the revenues generated by the Court and that the revenue generated from the

convictions in the Mayor's Court is not a significant portion of Gretna's general fund. For nearly two hours on January 24, 2020, the court held oral argument on Plaintiffs' Motion for Partial Summary Judgment.

The second Motion for Summary Judgment was filed by the defendants in March 2019 before the parties consented to proceed before the undersigned magistrate judge. (Rec. Doc. 77). The defendants argue that plaintiffs' claims are barred by the doctrines of absolute and sovereign immunity. They further argue that plaintiffs' conflict of interest claims are unsupported. The plaintiffs opposed the motion in April 2019, arguing that judicial, prosecutorial, and qualified immunity are not available in an official capacity lawsuit and further that these immunities do not preclude claims for equitable and declaratory relief. Plaintiffs also argue that judges can be enjoined as legislators and administrators. Finally, they argue that the revenue generated from the convictions in the Mayor's Court is a substantial portion of Gretna's General Fund sufficient to support a finding of a conflict of interest. At oral argument on the plaintiffs' Motion for Partial Summary Judgment, defendants requested that their Motion for Summary Judgment be supplemented with their opposition to plaintiffs' Motion for Partial Summary Judgment. Because plaintiffs had the opportunity to reply to the arguments and evidence submitted in the aforementioned opposition and because the court finds it in the interest of justice to resolve these matters at one time rather than requiring additional motion practice to raise the same issues, the court will consider defendants' opposition to plaintiffs' Motion for Partial Summary Judgment and plaintiffs' reply to same in resolving Defendants' Motion for Summary Judgment on the issue of the alleged financial conflict of interest.

Law and Analysis

1. *Standard for Motion for Summary Judgment*

Summary judgment under Federal Rule of Civil Procedure 56 must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56. The movant has the initial burden of "showing the absence of a genuine issue as to any material fact." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). The respondent must then "produce evidence or designate specific facts showing the existence of a genuine issue for trial." Engstrom v. First Nat. Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995). Evidence that is "merely colorable" or "is not significantly probative" is not sufficient to defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

"An issue is material if its resolution could affect the outcome of the action." Daniels v. City of Arlington, Tex., 246 F.3d 500, 502 (5th Cir. 2001). Thus, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Although this Court must "resolve factual controversies in favor of the nonmoving party," it must only do so "where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013) (quoting Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). The Court must not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

"Summary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so

overwhelming that it mandates judgment in favor of the movant." <u>Armstrong v. City of Dallas</u>, 997 F.2d 62, 67 (5th Cir. 1993). Summary judgment is also appropriate if the party opposing the motion fails to establish an essential element of his case. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

2. *Due Process – Institutional Financial Conflict*

a. *Material Facts*

Gretna has a mayor-aldermen form of government in which the Mayor holds executive authority over all departments of the city, except for the elected chief-of-police. The Mayor is responsible for preparation of a budget, signing of contracts, and signing of warrants drawn on the treasury. She has veto power over municipal ordinances, including budget ordinances.

Gretna has no independent judicial branch of government. Louisiana law establishes a mayor's court, which has jurisdiction over all violations of municipal ordinances. La. Rev. Stat. § 33:441(A)(1). "The mayor may try all breaches of the ordinances and impose fines or imprisonment, or both, provided for the infraction thereof." <u>Id.</u> The mayor can also impose court costs. <u>Id.</u> The same statute also provides that:

> the board of aldermen in its discretion may, upon request of the mayor, appoint one or more attorneys who shall be designated as court magistrate and who shall serve at the pleasure of the mayor and may from time to time be designated by the mayor to serve in his stead as the presiding official over the mayor's court.

Id. § 33:441(B)(1).[1] If a magistrate is so designated,[2] the magistrate exercises "the powers and authority of the mayor over such court." Id. The law further provides that the board of aldermen fixes the pay and salary of each magistrate. Id. Similarly, "the board of aldermen in its discretion may, upon request of the mayor, appoint one or more attorneys who shall be designated as prosecutor and who shall serve at the pleasure of the mayor." Id. § 33:441(B)(2). The board of aldermen fixes the pay and salary of such prosecutors as well. Id.

Gretna currently has two Magistrates who preside over Mayor's Court, defendant Toups and defendant Osborn. Their compensation is not tied to the volume, success, or revenues of the Mayor's Court. Each Magistrate presides over one trial day and one arraignment day per week. Magistrate Osborn estimated that at most he would work five hours a week as a magistrate. His salary is $87.55 per hour and he estimated his annual compensation was $12,000 and the most he has received in a year is $17,000-18,000. There appears to be no evidence of when Magistrate Osborn began serving in that capacity, but he was already serving as a Magistrate when the current Mayor was elected. (Rec. Doc. 117-5, at 2). Magistrate Toups estimated that a long day in court would be 12:45 to 4:00. His salary is $19,088 per year and he also receives healthcare benefits. He has presided over Gretna's Mayor's Court since 1995 and his salary has not changed except for

---

[1] This same rule is applicable to Gretna specifically via a separate statute which similarly provides that:

> The board of aldermen of the city of Gretna shall, upon request of the mayor, appoint an attorney who shall be designated as court magistrate and who shall serve at the pleasure of the mayor and may from time to time be designated by the mayor to serve in his stead as the presiding official over the mayor's court. Whenever the magistrate is so designated by the mayor to preside over the mayor's court, he shall exercise the powers and authority of the mayor over said court. The magistrate shall serve at a salary fixed and paid by the board of aldermen.

La. Stat. Ann. § 33:441.20

[2] As will become relevant to the immunities discussion below, the law also provides that "[t]he presiding officer of a mayor's court shall be entitled to judicial immunity for his official acts as presiding officer in the same capacity as a judge in this state." La. Stat. Ann. § 33:441(C)(1).

regular cost of living increases to all Gretna City employees. (Rec. Doc. 117-3, at 1-2). Both Osborn and Toups maintain a private law practice.

City Prosecutor Walter Leblanc spends 10-15 hours per week in that role and receives a salary of $73,447 and healthcare benefits as compensation for his work. His compensation is not dependent nor does it fluctuate with the volume, success, or revenues of the Mayor's Court.

All revenue generated by the Mayor's Court is deposited into the city's General Fund. The General Fund is used for the administration of the city, including every department that works within the city. The Mayor's Director of Finance produces a monthly budget report of revenues and expenditures for each city department, including the Mayor's Court. The Mayor and City Councilmembers each receive a copy of the report. The following reflects the revenues generated by the Mayor's Court as compared to Gretna's total revenue:

| Fiscal Year | 2017-18 | 2016-17 | 2015-16 | 2014-15 | 2013-14 | 2011-12[3] |
|---|---|---|---|---|---|---|
| Mayor's Court Conviction Revenue | $1,076,422 | $1,284,131 | $1,587.786 | $1,663,545 | $1,732,179 | $1,686,337 |
| Total General Fund Revenue | $16,797,495 | $17,502,366 | $22,026,500 | $18,000,996 | $18,177,296 | $17,295,304 |
| Mayor's Court Conviction Revenue as % of General Fund | 6.4% | 7.3% | 7.2% | 9.2% | 9.5% | 9.8% |

[3] This data was presented by the plaintiffs in their Statement of Uncontested Facts. In a supplemental memorandum submitted by the plaintiffs following oral argument, they provided additional data for the Fiscal Year 2012-2013, which had been omitted from the original presentation of facts because the data was not available at the time. Using a cached, online version of Gretna's Operating Budget for 2014-2015, which contains audited figures for 2012-2013, the plaintiffs present the following figures for 2012-2013:

| Mayor's Court Conviction Revenue | Total General Fund Revenue | Mayor's Court Conviction Revenue as % of General Fund |
|---|---|---|
| $1,493,714 | $18,031,464 | 8.28% |

According to the analysis in the defendants' expert report, for the 2018-2019 fiscal year,[4] the revenues related to Mayor's Court fines and forfeitures represent 6.8% of Gretna's total general fund. The defendants have also compared the Mayor's Court net income to Gretna's general fund and have determined that for the 2018-2019 fiscal year through March 31, 2019, net income of the Mayor's Court is 1.4% of the General Fund. Defendants also report that budgeted revenues from the Mayor's Court for the fiscal year ending March 31, 2020, represent 7.4% of the General Fund, while the budgeted net income for the same period is 1.98% of the General Fund.

Director of Finance Raylyn Stephens testified that if revenue from the Mayor's Court was eliminated, Gretna would have to reduce its expenditures. (Rec. Doc. 113-3, at 7). Mayor Constant testified that with a loss of revenue of $500,000, she would have to reevaluate her budgeting process in the following year. (Rec. Doc. 113-4, at 14).

---

[4] This includes the actual amounts through December 31, 2018, and annualized amounts for the fiscal year ended March 31, 2019.

Plaintiffs also cite the revenue generated by the Deferred Prosecution Program that they challenge in this lawsuit, which increased from nothing in 2005-2006 to $635,276 in 2016-2017. They have calculated the percentage of the General Fund made up of revenues from the Deferred Prosecution Program as well as the percentage of the General Fund made up of revenues from the Deferred Prosecution Program and the Mayor's Court combined:

| Fiscal Year | 2017-18 | 2016-17 | 2015-16 | 2014-15 | 2013-14 | 2011-12[5] |
|---|---|---|---|---|---|---|
| Deferred Prosecution Revenue | $542,644 | $635,276 | $736,044 | $785,776 | $388,296 | $457,648 |
| Deferred Prosecution Revenue as % of General Fund | 3.2% | 3.6% | 3.3% | 4.4% | 2.1% | 2.6% |
| Deferred Prosecution and Mayor's Court Revenue as % of General Fund | 9.6% | 10.9% | 10.6% | 13.6% | 11.7% | 12.4% |

b.  *Applicable Law*

The English common law upon which the American legal system draws "assumed that judges could maintain impartiality in the face of most connections to a case." Caliste v. Cantrell, 937 F.3d 525, 527 (5th Cir. 2019). "But the common law view that judges were incorruptible had

---

[5] Plaintiffs' supplemental memorandum presents the following data for Fiscal Year 2012-2013:

| Deferred Prosecution Revenue | Deferred Prosecution Revenue as % of General Fund | Deferred Prosecution and Mayor's Court Revenue as % of General Fund |
|---|---|---|
| $444,444 | 2.46% | 10.75% |

a notable exception—when judges might benefit financially." Id. at 528. The applicable standards governing the constitutionality of a judge's financial conflict originate with the United States Supreme Court's decision in Tumey v. Ohio, concerning a system where the mayor of a village held trial for violations of the Prohibition Act and where fees collected from convicted defendants were split between the state and the village. 273 U.S. 510, 514, 520-22 (1927). A portion of the fees collected also paid the fees and costs of the mayor as compensation for conducting the hearings, in addition to his regular salary. Id. The Court held that

> it certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case.

Id. at 523. The Court further concluded that where a judge is paid for his service upon conviction, due process is satisfied only where "the costs usually imposed are so small that they may be properly ignored as within the maxim 'de minimis non curat lex.'" Id. at 531. In finding that the system before it did not satisfy due process, the court made clear that the issue is not whether a particular mayor's judgment was affected by the potential receipt of his costs. Id. at 532. Instead, the Court held that "[e]very procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law." Id. In addition to finding that the mayor's pecuniary interest violated the defendant's right to due process of law, the Court also found problematic that the mayor acted as judge without a jury while also acting as chief executive of the village, which could employ detectives and other assistants to bring offenders before the mayor's court and could thereby generate income for the village to relieve it from further taxation. Id. at 533. The Court observed that "[a] situation in which an official perforce occupies two practically and seriously inconsistent

positions, one partisan and the other judicial, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him." Id. at 534.

In contrast, the Supreme Court in Dugan v. Ohio found that conviction before another mayor's court did not violate due process. 277 U.S. 61, 65 (1928). In Dugan, the mayor could convict individuals for possession of intoxicating liquor and fine them substantial amounts that were paid half to the city treasury. Id. at 62. The mayor did not receive fees directly, but his salary was paid out of the city treasury. Id. The Supreme Court determined that unlike the mayor in Tumey, whose duties were primarily executive, the mayor in Dugan had no executive and exercised only judicial functions. Id. at 63. The city was governed by a five-member commission that exercised all the legislative power and a manager that exercised all of the city's executive power. Id. The mayor's salary was fixed by the members of the commission other than the mayor, and he would receive his salary whether he convicted defendants or not. Id. at 63, 65. The court found that "as one of five members of the city commission, [the mayor's relation] to the fund contributed to by his fines as judge, or to the executive or financial policy of the city, is remote." Id. at 65.

The Supreme Court considered another mayor's court in Ward v. Village of Monroeville, Ohio, elaborating on the standard announced in Tumey. 409 U.S. 57, 59-60 (1972). In Ward, "[a] major part of village income is derived from the fines, forfeitures, costs, and fees imposed by him in his mayor's court." Id. at 58. Over a period of five years, these amounts made up between 37% and 51% of total village revenues. Id. The Court underscored the "average man as judge" test announced in Tumey and clarified that even where a mayor does not directly receive fees and costs, the unconstitutional "'possible temptation' may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of

contribution from the mayor's court." Id. at 60. The Court found the availability of appeal and trial

de novo in the County Court of Common Pleas was insufficient to correct the unfairness at the trial

level. Id. at 61.

In Brown v. Vance, the United Sates Fifth Circuit Court of Appeals explained that the

Supreme Court in Tumey and Ward was not interested in a particular judge's actual bias but:

> was interested rather in the inherent defect in the legislative framework arising from
> the vulnerability of the average man—as the system works in practice and as it
> appears to defendants and to the public. The Court's inquiry there and our inquiry
> here is not whether a particular man has succumbed to temptation, but whether the
> economic realities make the design of the fee system vulnerable to a "possible
> temptation" to the "average man" as judge."

637 F.2d 272, 284 (5th Cir. 1981). The Brown case involved a system where instead of a salary,

justice court judges in Mississippi received a fee for each criminal case docketed, regardless of the

outcome. Id. at 275. Some districts had two judges per district. Id. As to fees issued for criminal

cases docketed in such districts, the court of appeals held that where:

> the possibility exists that judges in [the districts with more than one judge] will
> compete for business by currying favor with arresting officers or taking biased
> actions to increase their caseload, we conclude that, under the fee system, a judge
> might minimize the burden of proof required to convict the defendant or might be
> less than diligent in protecting the defendant's constitutional rights. The fee system,
> therefore, does not satisfy the Tumey-Ward test and deprives criminal defendants
> of their due process right to a trial before an impartial tribunal.

Id. at 282. The court of appeals also held that the system of the judges collecting a per case fee in

civil cases violated due process. Id. at 286. The court explained that:

> The compensation the justice court judges in Mississippi derive from civil cases
> depends directly on the volume of cases filed. Creditors could choose, in any county
> in which suit is proper, which judge to decide their cases. It is reasonable to infer,
> and the record supports the inference, that creditors would file more frequently in
> the courts of the judges who tended to favor the plaintiffs.

Id. at 284.

The Fifth Circuit recently applied the <u>Tumey-Ward</u> standard in assessing the constitutionality of two funding sources of the judicial expense fund ("JEF") of the Orleans Parish Criminal District Court ("OPCDC").[6] In <u>Cain v. White</u>, plaintiffs challenged the assessment of fines and fees against criminal defendants by the judges of OPCDC. 937 F.3d 446, 448 (5th Cir. 2019), <u>petition for cert. filed</u>. The fines and fees collected were mostly directed to the JEF, making up about one-quarter of the JEF. <u>Id.</u> The judges have exclusive control over how the JEF is spent. <u>Id.</u> Although the JEF did not go towards their salaries, it funded salaries and employment-related benefits of staff, CLE travel, conferences and legal education, office supplies, jury expenses, professional liability insurance for the judges, etc. <u>Id.</u> at 448-49. The district court held that "with respect to all persons who owe or will incur court debts arising from cases adjudicated in OPCDC, and whose debts are at least partly owed to the OPCDC Judicial Expense Fund, the Judges' failure to provide a neutral forum for determination of such persons' ability to pay is unconstitutional." <u>Id.</u> at 451. The court of appeals summarized the issue as "whether the Judges' administrative supervision over the JEF, while simultaneously overseeing the collection of fines and fees making up a substantial portion of the JEF, crosses the constitutional line." <u>Id.</u> The court of appeals affirmed, finding the case to be comparable to <u>Ward</u> and concluding that "when everything involved in this case is put together, the 'temptation' is too great." <u>Id.</u> at 454 (footnote omitted).

In <u>Caliste v. Cantrell</u>, the Fifth Circuit considered another funding source for the JEF. The plaintiffs challenged a system where a magistrate judge for OPCDC presides over initial appearances and when setting conditions of pretrial release has the option of requiring a secured

---

[6] In both cases the court of appeals reaffirmed the "average man as judge" standard announced in <u>Tumey</u>, rejecting plaintiffs' argument that a new standard had been created by the use of an ellipsis in the "average . . . judge" standard. <u>Cain v. White</u>, 937 F.3d 446, 453 (5th Cir. 2019); <u>Caliste v. Cantrell</u>, 937 F.3d 525, 531 (5th Cir. 2019). Plaintiffs here do not attempt to raise that argument.

money bond, which defendants typically obtain by purchasing a bond from a commercial surety. Id. at 526. When a defendant buys a commercial bond, 1.8% of the value is deposited in the court's JEF pursuant to state law. Id. These bond fees funded 20-25% of the JEF. Id. The magistrate is a member of the committee that allocates the funds. Id. The court of appeals held that the arrangement violates due process. Id. at 532. The court explained that the magistrate judge's "dual role—the sole source of essential court funds and an appropriator of them—creates a direct, personal, and substantial interest in the outcome of decisions that would make the average judge vulnerable to the 'temptation ... not to hold the balance nice, clear, and true.'" Id. (quoting Tumey, 273 U.S. at 532). In so holding, the court of appeals distinguished other arrangements such as fines assessed in federal criminal cases because such fines "are not set aside for judicial operations at the national level, let alone for the handful of federal judges who sit on a local district court." Id. at 532. In such a situation, "[t]he benefits are so diffuse that a single judge sees no noticeable impact on her chambers from the fines she imposes and thus feels no temptation from them." Id.

The plaintiffs cite two out of circuit cases. The first is Rose v. Village of Peninsula, where the Northern District of Ohio considered a system where the mayor was the chief executive officer of the village, he was responsible for the village's financial condition, he was the chief conservator of the peace, he was responsible for hiring the officer that issued the plaintiff a traffic citation, and he also served as judge finding the plaintiff guilty of the traffic offenses with which she was cited. 875 F. Supp. 442, 445 (N.D. Ohio 1995). Fines generated by the mayor's court made up 11-14% of general fund revenue. Id. at 450. The court found that annual collection of funds over $50,000 amounting to over 10% of the village's general fund were substantial and made up a major part of village income. Id. at 450-51. The court noted that "any person suddenly deprived of 10% or more of his income would find the loss 'substantial.'" Id. at 451. The court added that "[w]hile

substantiality is clearly an important factor in the analysis, the thrust of the inquiry is whether the mayor 'occupies two practically and seriously inconsistent positions, one partisan and the other judicial.'" Id. at 452. The court went on to explain its balancing approach:

> The amount of mayor's court fee revenues is just one measure of whether the mayor may reasonably be questioned as being impartial. The more substantial the amount (or percentage) of revenue produced from a mayor's court, the more reasonable it is to question the impartiality of a mayor who has any executive authority. In similar fashion, the more executive authority vested in the mayor, the more reasonable it is to question the impartiality of a mayor who collected even a relatively minor amount of general fund revenue through a mayor's court.

Id. In the case before it, the court found that "the level of executive authority vested in [the mayor] is broad, so that it becomes reasonable to question [the mayor's] impartiality even if he collects a fairly small amount of general fund revenue through the mayor's court." Id. at 453. The court granted plaintiff's motion for summary judgment finding that the mayor could not, as a matter of law, be a disinterested and impartial judge because of his dual roles as chief executive responsible for the village's financial condition and judge in the mayor's court where he had heard and decided the plaintiff's contested case. Id. at 448, 453.

In DePiero v. City of Macedonia, the Sixth Circuit Court of Appeals considered and employed the Rose court's approach of analyzing the combination of the level of executive power of the adjudicator and the percent of the general fund funded by fees generated through his adjudications, rather than focusing on the whether the percentage of revenue alone was substantial. 180 F.3d 770, 780 (6th Cir. 1999). In DePiero, the mayor was vested with broad executive powers; he exercised control over all departments and divisions of the municipality except the city council and he presided over council meetings and voted in the event of a tie. Id. He prepared an annual budget and submitted it to the council and had the power to appoint, promote, and remove any official or employee except those elected under the city charter and employees of the council. Id.

15

at 781. As to police officers, the civil service commissioner would certify the top three applicants for an open position and the mayor would choose one. Id. at 782. Nine percent of the city's general fund was derived from mayor's court fines in 1990 and between 1994 and 1996, about four percent of the general fund was derived from mayor's court fines. Id. at 780. The defendants argued the court should consider that only 2% of the general fund was made up of amounts generated by the mayor's court if net revenues generated by the mayor's court were considered. Id. But the court declined to "split hairs over what is a 'substantial' figure," focusing instead on the level of executive authority vested in the mayor. Id. The plaintiff argued that his adjudication and sentencing before the mayor for a traffic violation violated due process because the mayor, as a law enforcement officer and chief executive responsible for the financial condition of the municipality, was not neutral or detached. Id. at 776. The court of appeals reversed the district court's grant of summary judgment in favor of the defendants, holding that "the broad reach of [the mayor's] executive powers and his sweeping administrative responsibilities necessarily puts him in 'two practically and seriously inconsistent positions, one partisan and the other judicial.'" Id. The court also found that the fact "[t]hat under the Charter [the mayor] may delegate administrative responsibilities for more efficient administration dilutes neither the power with which he is vested nor his accountability for law enforcement and the fiscal health of the municipality as its chief executive." Id. As defendants here point out, the court observed in a footnote that:

> We do not decide in this case whether plaintiff would have been deprived due process had his case been tried by the Mayor's Court Magistrate instead of [the Mayor] himself. It is worth noting, however, that mayor's court magistrates are less vulnerable to potential bias. Mayor's court magistrates are appointed by the mayor, but exercise only judicial functions.

Id. at 782 n. 4.

16

In addition to the alleged conflict of interest of the Magistrates as surrogates of the Mayor, this case also raises the issue of a prosecutor's conflict of interest. In <u>Marshall v. Jerrico, Inc.</u>, the Supreme Court observed that

> Prosecutors need not be entirely "neutral and detached." In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law. The constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive for securing civil penalties.

446 U.S. 238, 248-49 (1980) (citation omitted). The Court explained that "[t]he rigid requirements of <u>Tumey</u> and <u>Ward</u>, designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity." <u>Id.</u> at 248. Nonetheless, the Supreme Court announced that "[w]e do not suggest . . . that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors." <u>Id.</u> at 249.

As to the facts presented by the <u>Marshall</u> case, however, the Supreme Court concluded that there was no such Due Process violation. <u>Id.</u> at 251-52. The plaintiffs in <u>Marshall</u> challenged as unconstitutional the monetary penalties assessed by the assistant regional administrator of the Employment Standards Administration of the Department of Labor ("ESA") where the authorizing statute required the fines collected be returned to the ESA as reimbursement for enforcement expenses and allowed the ESA to allocate such fines to its various regional offices. <u>Id.</u> at 240. The penalties collected amounted to 1% of the budget of the ESA and in all the relevant years, the ESA returned to the Treasury as unused a portion of the budget that was substantially greater than the penalties. <u>Id.</u> at 250-51. Additionally, the national office of the ESA and not any regional administrator decided how to allocate the civil penalties back to the regional offices. <u>Id.</u> at 251. The only time the ESA allocated funds to the regional offices it did so in proportion to the expenses incurred in investigating and prosecuting, not on the basis of the penalties collected. <u>Id.</u> The

Supreme Court concluded that the possibility that a regional administrator might be tempted to devote an unusually large quantity of resources and assess an unjustified number of penalties at an unduly high amount "in the hope that he would ultimately obtain a higher total allocation of federal funds to his office" was "too remote to violate the constraints applicable to the financial or personal interest of officials charged with prosecutorial or plaintiff-like functions." Id. at 251-52.

As an example of when institutional incentives have been found to unconstitutionally distort a prosecutor's enforcement efforts, plaintiffs cite Harjo v. City of Albuquerque. There a district court held that the city's "forfeiture officials have an unconstitutional institutional incentive to prosecute forfeiture cases, because forfeiture revenues are set in a special fund, and the forfeiture program can spend, without meaningful oversight, all of the excess funds it raises from previous years." Harjo , 326 F. Supp. 3d 1145, 1193 (D.N.M. 2018). The court noted that although the city council had the authority to allocate funds to the forfeiture program, it did so based on estimated revenues as opposed to estimated costs. Id. at 1194. The program could spend more than budgeted as long as revenues were raised to cover the spending via retroactive approval by the city council. Id. The court observed:

> the City of Albuquerque could craft a constitutional forfeiture program by altering how it funds the program. For example, the City of Albuquerque could -- instead of placing forfeiture revenues in a special fund -- place forfeiture revenue directly into its general fund and then appropriate money from that fund to pay for the forfeiture program's expenses. Should the City of Albuquerque continue its practice of mechanically approving the forfeiture program's after-the-fact spending, there might still be constitutional concerns, but with the revenues placed in the general fund, there is far less reason to think that the City of Albuquerque would be a rubber stamp, given its many financial obligations.

Id.  at 1197. The Harjo court also concluded that the forfeiture officials did not have an unconstitutional personal incentive to favor the city over property owners because their continued employment or salary was not contingent on program revenues. Id. at 1199.

### c.  Parties' Arguments

Plaintiffs argue that summary judgment in their favor is appropriate in this case because the revenue generated by the Mayor's Court coupled with the Mayor's ultimate control over the prosecution and adjudication of offenses results in an impermissible conflict of interest that would present at least the temptation to the average person to rule in favor of the court's revenue over the interests of justice. They argue that because the City Prosecutor and the Magistrates can be terminated from their positions by the Mayor, this results in a single branch of government having authority over the prosecution and adjudication of guilt, thereby generating revenue for Gretna. Plaintiffs submit this case is similar to Tumey where the court found the law was "calculated to awaken the interest of all those in the village charged with the responsibility of raising the public money and expending it, in the pecuniarily successful conduct of such a court." 273 U.S. at 533-34. As specific examples of the similarity, plaintiffs point to alleged evidence that the Gretna police have an arrest quota system.

Plaintiffs argue that the appointment of a Magistrate by the Mayor does not shield the Mayor's Court from an impermissible temptation under Ward. They submit that as a matter of law, the Magistrates are dependent on the Mayor for continued employment while the Mayor is dependent on the Magistrates for revenue to manage the city. They insist that the average person in the Magistrates' position, knowing that the funds they generate allow their boss to perform her functions, would experience a possible temptation to forget the burden of proof required to convict a defendant.

Plaintiffs admit that the Fifth Circuit has not addressed the existence of a conflict in the case of a deputized judicial officer. They cite a 1702 English case that was also cited by the Tumey Court. In City of London v. Wood, defendant Wood had been sued in the London Mayor's Court

by the Mayor and Commonality of London and subjected to a fine for failing to execute his duties as sheriff. 88 Eng. Rep. 1592, 1592-93 (K.B. 1702). The Mayor of London did not preside directly over the court, but instead employed a deputy "Recorder" to act as judge. Id. at 1603. The King's Bench held that the case was "virtually held before the mayor and alderman" because "a deputy acts, and of right ought to act, in the name of his principal." Id. Essentially, the plaintiffs here appear to be arguing that the Magistrates act as agents for the Mayor and are exposed to the same temptation as the Mayor to maintain revenue.

Plaintiffs also argue that the Magistrates receive generous compensation. They extrapolate Magistrate Osborn's salary to $182,104 annually if he were to work full time. They say Magistrate Toups receives a flat salary of $19,088 for less than eight hours of work per week and he also receives health benefits. Plaintiffs argue that the average person in the position of the Magistrates would be aware that they need to act in the interest of their employer in order to maintain their jobs. They submit that the Magistrates have an institutional conflict of interest because they work under the Mayor, who has executive control of the City of Gretna's General Fund, which is funded in part by the Mayor's Court's revenues and which is used to fund the operations of the city. They add that the subjective feelings of Magistrates Toups and Osborn are irrelevant to the determination.

Plaintiffs next argue that the revenue generated from the Mayor's Court is significant, amounting to 6.4% to 9.8% of Gretna's budget annually since 2011. They cite the Rose case where the court found 10% to be "substantial." Plaintiffs insist this court should not consider net income as proposed by the defendants. They point out that defendants have cited no case to support relying on net income instead of gross revenue, noting that the Sixth Circuit explicitly declined to do so in DePiero.

Next the Plaintiffs argue that the Mayor and the City Prosecutor have an institutional conflict of interest in administering the Deferred Prosecution Program and Charging Decisions. They argue that because the City Prosecutor serves at the pleasure of the Mayor, the Mayor is the party and the judge in the same case. They add that the City Prosecutor's charging decisions resulted in the revenue generated by the Mayor's Court. They submit that the City Prosecutor's compensation is significant and they argue that an average person in that position would face a temptation to increase the number of charges accepted to further the Mayor's interests. Thus, they insist, the City Prosecutor has an institutional conflict of interest that violates due process.

The defendants oppose. They insist that Gretna has removed any potential conflicts of interest by hiring Magistrates as independent arbiters. They point out that the income of the Magistrates and City Prosecutor do not fluctuate dependent on convictions. They argue that Tumey, Ward, Caliste, Cain, and Brown are distinguishable. They submit that this case is more like Dugan where the Supreme Court found no due process violation by a system where a mayor presided over contested cases but was not the chief executive and had no pecuniary interest in the cases tried before him. They point out that in the DePiero case, the court noted (without deciding) that mayor's court magistrates are less vulnerable to potential bias even though appointed by the mayor because they exercise only judicial functions. 180 F.3d at 782.

Defendants cite the Rose case and argue that the question is not solely one of substantiality of the revenue. This is but one of the factors. Defendants further argue that the revenue generated by the Mayor's Court here is not a significant portion of the General Fund. They point out that in Tumey, fines made up 50% of the towns General Fund and in Ward, fines made up 36%-50% of the town's general fund. In Caliste, bond fees collected were 20-25% of the judicial expense fund and in Cain, fines were about 20% of the judicial expense fund. They recognize that in Rose, the

district court found that revenues making up a little over 10% of a general fund are described as substantial. Defendants point to the Second Circuit Court of Appeals' decision in <u>Wolkenstein v. Reville</u>, which described fines and penalties representing little more than half of one percent of a school board's entire budget as insubstantial. 694 F.2d 35, 36 (2d Cir. 1982). Defendants also cite <u>Milliken & Michaels of Arizona, Inc. v. Houseworth</u>, where monetary penalties collected by the government department issuing those penalties amounted to 2.7% to 5.5% of a fund used to pay certain salaries and other expenses of the department. 942 F. Supp. 454, 456 (D. Ariz. 1996). The district court found that this constituted "a minuscule percentage of the total departmental revenue." <u>Id.</u>

Defendants cite their expert report, which calculates Mayor's Court fines and forfeitures as 6.8% of the General Fund for the fiscal year ending March 31, 2019, and 7.4% for the fiscal year ending March 31, 2020. Their expert has also calculated the net income of the Mayor's Court as 1.4% of the General Fund for the fiscal year ending March 31, 2019, and 1.98% for the fiscal year ending March 31, 2020.[7] Defendants insist that whether gross or net is used, the revenues generated are insubstantial.

  d.   *Analysis*

Unlike <u>Tumey</u> and <u>Brown</u> where the adjudicator received a direct, personal benefit, this case presents an alleged indirect benefit from the flow of funds collected by the Mayor's Court into Gretna's general fund. The case law appears to support the approach taken by the <u>DePiero</u> and <u>Rose</u> courts, which considers the totality of the circumstances and does not focus solely on a

---

[7] At oral argument, defendants' counsel recognized that all of the cases consider total revenue, not net income, as a percentage of a fund. But counsel argued that in considering the totality of the circumstances, the court might be aided in considering the net income from the Mayor's Court because this figure would show how much of the revenues from the Mayor's Court the Mayor could actually use in administering parts of the Gretna government besides the Mayor's Court itself.

threshold revenue amount in determining whether a system offends due process. The Fifth Circuit, in Cain, for example, focused on the "totality of this situation, not any individual piece." 937 F.3d at 454. The court takes the same approach here.

Clearly the substantiality of the fees generated is an important factor. The plaintiffs describe the revenue generated by the Mayor's Court as "staggering." The court must disagree. The revenues are not insignificant, but 6-7% annually since 2015 is far from a staggering proportion of the whole.[8] Nonetheless, the defendants overstate the jurisprudence. The Wolkenstein court found .05% insubstantial and the Milliken court found 2.7% to 5.5% to be minuscule, but the Rose court held figures over 10% would be substantial. The figures here reach nearly 10% for the fiscal years ending in 2012, 2014, and 2015. In DePiero, fines making up 4-9% of the general fund, coupled with the mayor's broad executive authority, resulted in a finding that the mayor's adjudication of municipal violations offended due process.

The plaintiffs here argue that revenues generated by the Deferred Prosecution Program should be considered in assessing the fees generated by the Mayor's Court because had the defendants not participated in the Deferred Prosecution Program, they would have appeared before the Magistrates and might have been required to pay fines. The court is not convinced such revenues can properly be attributed to the structural temptation potentially felt by the Magistrates. According to the First Amended Complaint, participants in the Deferred Prosecution Program have their charges dismissed for an agreement to pay a set fine. Thus, participants are not found guilty

---

[8] The defendants have presented evidence showing that net income generated by the Mayor's court amounts to 1.4% of the General Fund for the fiscal year ending March 31, 2019, and 1.98% for the fiscal year ending March 31, 2020. There is no jurisprudential support for using net income rather than gross revenue when weighing the possible temptation, which defendants readily conceded at oral argument. The court does not do so here. Nonetheless, the net income figures reflect the percentage of non-court spending by the City of Gretna that is funded by the operations of the Mayor's Court. As suggested by the defendants at oral argument, in considering the totality of the circumstances, these figures indicate the minimal effect of Mayor's Court revenue on the Mayor's other funding priorities.

by the Magistrates, and Magistrates are not tasked with applying the appropriate burden of proof to the evidence before them. As a result, there is no opportunity for the Magistrates to forget the burden of proof or fail to hold the balance nice, clear, and true.  If such revenues were included, however, the range of revenues as a portion of the General Fund ranges from 9.6% to 13.6%. Even these are hardly "staggering," though closer to the range considered sufficient in <u>Cain</u> and <u>Caliste</u>. Under either calculation, the relative volume of funds generated by the Mayor's Court might create an impermissible conflict of interest if, like in <u>Rose</u> and <u>DePiero</u>,[9] the Mayor herself served as the adjudicator. 180 F.3d at 776. But that is not the case here.

Accordingly, the court now turns to consider the overlap in the executive and judicial functions. There is no dispute that the Magistrates who actually adjudicate the cases do not have any administrative or executive authority over the General Fund or Gretna itself. The <u>Cain</u> and <u>Caliste</u> cases are therefore distinguishable. There is no discernible connection between the Magistrates and the City Prosecutor. There is no dispute that Magistrates' salary is not tied to the volume of convictions. Nor does the Mayor herself control their salary. By law, the council does so. La. Rev. Stat. § 33:441(B)(2). Therefore, it is not possible for the Mayor to use a change in salary to pressure Magistrates to convict and thus collect more fines.

Plaintiffs' "temptation" argument turns on the fact that by state law, the Magistrates serve at the pleasure of the Mayor who also appoints the City Prosecutor and is also responsible for administering the General Fund.[10] As a result, they argue, the Magistrates may be tempted to convict in order to increase the General Fund for the Mayor's benefit to avoid being dismissed

---

[9] As discussed above, in both <u>Rose</u> and <u>DePiero</u>, the mayor himself presided over the adjudication of guilt or innocence and the sentencing of convicted defendants. <u>DePiero</u>, 180 F.3d at 777; <u>Rose</u> 875 F. Supp at 445. This is a critical distinction with the present matter.

[10] Defendants highlighted at oral argument that state law mandates the structure of all Louisiana Mayor's Courts, and thus they lack the discretion to establish a different system for terminating magistrates, for example, to remove the Mayor's discretion or give the City Council this power.

from their positions. They suggest the risk of losing a "lucrative" income source would tempt the average person as judge. But plaintiffs fail to show that the Magistrates' salaries would be considered lucrative by the average person in the position of Toups or Olden. They both maintain their own private law practices. Attorneys' fee awards in this district regularly find hourly rates of $240 or more to be reasonable.[11] There is nothing to suggest that the average attorney with the experience of Olden or Toups would be tempted to skew the burden of proof because of the risk of losing a part-time job that paid $87.55 per hour. Moreover, there is no other evidence to support plaintiffs' "threat of dismissal" theory. The Magistrates were not subject to periodic performance reviews by the mayor where the issue of fee generation might have arisen. Indeed, the evidence indicates the Mayor only met with the Magistrates here once at the beginning of her term. Both Magistrates have served more than one mayor, indicating the permanency and non-political nature of the appointments. Further, the actual revenue figures do not suggest any pressure exerted on the Magistrates. Although there is some fluctuation, the general trend in the figures submitted by the parties show that revenues generated by the Mayor's Court have generally decreased over time, amounting to 9.8% of the General Fund in Fiscal Year 2011-2012 and 7.3% of the General Fund in Fiscal Year 2016-2017 (the last full fiscal year before this lawsuit was filed).  Despite this

---

[11] E.g., Norris v. Causey, No. CV 14-1598, 2016 WL 1046101, at *9 (E.D. La. Mar. 16, 2016) (finding rates of $250, $200, and $150 were reasonable for attorneys with 31, 12 and 8 years respectively); Jefferson v. Baywater Drilling, LLC, No. CV 14-1711, 2015 WL 7281612, at *1 (E.D. La. Nov. 17, 2015) (affirming magistrate judge's report and recommendation, Rec. Doc. 51, finding that rates of $500 and $450 per hour were reasonable for two attorneys with 40 years of experience in maritime litigation and that $240 per hour was reasonable for an attorney with seven years' experience in maritime litigation); Adams v. City of New Orleans, No. CIV.A. 13-6779, 2015 WL 4606223, at *3 (E.D. La. July 30, 2015) (rate of $350 per hour reasonable for an attorney with 29 years of experience); Receivables Exch., LLC v. Advanced Tech. Servs., Inc., No. CIV.A. 14-668, 2015 WL 2372434, at *5 (E.D. La. May 18, 2015) (finding a rate of $240 reasonable for an attorney with 23 years of experience in commercial litigation); Offshore Marine Contractors, Inc. v. Palm Energy Offshore, LLC, No. CIV.A. 10-4151, 2014 WL 5039670 (E.D. La. Sept. 25, 2014) (affirming the magistrate judge's report and recommendation finding that $325 an hour, $275 an hour and $225 an hour were reasonable rates for attorneys with 19, 7, and 4 years of experience, respectively); J & J Sports Prods., Inc. v. Evolution Entm't Grp., LLC, No. CIV.A. 13-5178, 2014 WL 6065601, at *1 (E.D. La. Nov. 12, 2014) (affirming magistrate judge's finding that $300 per hour was reasonable for an attorney with 32 years of experience in a case where the rate was not contested).

decrease, the Magistrates were not dismissed from their jobs and there is no evidence that their salary changed.

The court concludes that the present case does not present an institutional financial conflict of interest in the Mayor's Court. The structure of the Mayor's Court as implemented by the City of Gretna does not present an impermissible temptation. The funds generated by the Mayor's Court are not insignificant, but when considered in conjunction with the degree of separation between the Mayor and the Magistrates that actually adjudicate cases before the Mayor's Court, the court cannot find that the Magistrates face a possible temptation to forget the burden of proof and convict the defendants before them, failing to hold the balance nice, clear and true between the state and the accused.

As to the City Prosecutor, the facts are nearly identical to those of the Magistrates. Yet, as plaintiffs concede, a higher standard applies before an impermissible conflict of interest can be found. The plaintiffs rely on the Harjo case, but that decision supports finding Gretna's system constitutional.  The Gretna City Prosecutor's salary is not tied to convictions or revenues raised by the Mayor's Court and the Deferred Prosecution Program. Thus, as in Harjo, there is no personal financial incentive to overzealously prosecute. Unlike in Harjo, where an institutional conflict of interest was found, there is no evidence to suggest that the Gretna City Prosecutor gets to decide how to spend the funds generated by his prosecutions or that excess spending will be authorized as long as the funds generated by the prosecution support it. In describing a system that would likely pass constitutional muster, the Harjo court essentially described the Gretna City Prosecutor by envisioning a system where a city placed forfeiture program revenues "directly into its general fund and then appropriated money from that fund to pay for the forfeiture program's expenses" without "mechanically approving . . . after-the-fact spending." 326 F. Supp. 3d at 1197. Given that

in contrast to adjudicators, "prosecutors are permitted to be zealous in their enforcement of the law," Marshall , 446 U.S. at 238–39, the court cannot find that the possibility of dismissal by the Mayor, coupled with the percentage of the General Fund generated by the City Prosecutor's actions, is sufficient to create an unconstitutional conflict of interest.

   3.   *Immunities*

      a.   *Defendants' Argument*

Louisiana law provides that "[t]he presiding officer of a mayor's court shall be entitled to judicial immunity for his official acts as presiding officer in the same capacity as a judge in this state." La. Rev. Stat. § 33.441(C)(2). "Judges are entitled to absolute immunity from claims for damages arising out of acts performed in the exercise of their judicial functions." Johnson ex rel. Williams v. Louisiana, No. CIVA 06-0894, 2006 WL 3462929, at *2 (E.D. La. Nov. 28, 2006). "[U]nder 42 U.S.C. § 1983, injunctive relief is not available against a state judge acting in his official capacity." Id. Defendants argue that Magistrates Osborn and Toups are entitled to judicial immunity because plaintiffs have not alleged that they were acting outside of their judicial capacity and without jurisdiction.

Similarly, prosecutors are immune from suit under §1983. Imbler v. Pachtman, 424 U.S. 409, 428–29. Defendants argue that city prosecutor Leblanc is entitled to absolute prosecutorial immunity because plaintiffs have not alleged him to be acting outside of his official capacity or without jurisdiction.

Defendants also invoke qualified immunity, which shields government officials from liability based on the performance of discretionary functions. Beltran v. City of El Paso, 367 F.3d 299, 303 (5th Cir. 2004). If the government officials show they were acting in their official capacity and within the scope of their discretionary authority, the burden shifts to the plaintiff to show that

the defense does not apply. <u>Id.</u> To determine if qualified immunity is applicable, "[f]irst, the court must determine whether the plaintiff has alleged a violation of a clearly established federal constitutional or statutory right. Second, the court must determine whether the official's conduct was objectively reasonable in light of the clearly established legal rules at the time of the alleged violation." <u>Id.</u>

Defendants argue that qualified immunity is applicable here because they were acting in conformity with La. Rev. Stat. § 33:441 and they reasonably believed their actions were legal and in conformity with Louisiana law.

Defendants point out that the plaintiffs only assert claims against them in their official capacities. They argue that to succeed in an official capacity suit against a city, they must prove that the city itself caused the constitutional violation at issue. Indeed, a local government is only liable under §1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." <u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658, 694 (1978). To establish an official policy, the plaintiff must show

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

<u>Bennett v. City of Slidell</u>, 735 F.2d 861, 862 (5th Cir. 1984). Defendants also argue that the plaintiffs' claim should be dismissed because they have not established liability of the City of

Gretna. They further argue that the net income of the Mayor's Court as a percentage of the General Fund and argue that plaintiffs cannot establish an unconstitutional conflict of interest.

      *b. Plaintiffs' Argument*

Plaintiffs respond that defendants' immunities claims must fail because they have not sued defendants in their individual capacities, nor have defendants been sued for damages.[12] "The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment." <u>Kentucky v. Graham</u>, 473 U.S. 159, 167 (1985). Further, "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." <u>Pulliam v. Allen</u>, 466 U.S. 522, 541–42, (1984).

Plaintiffs also challenge defendants' argument that they cannot establish a policy, practice or custom sufficient for municipal liability to attach. They argue that there can be no dispute that they are challenging the acts of final policy makers because Mayor Constant is clearly a final policy maker. They add that when the Magistrates sit in the Mayor's Court, they exercise the Mayor's authority over adjudications. They say the city prosecutor similarly exercises final

---

[12] In the "Request for Relief" of their First Amended Complaint, plaintiffs ask this court to:

    A. Declare that the Gretna Mayor's Court suffers from an unconstitutional conflict of interest that violates Due Process rights of those defendants appearing before it.

    B. Declare that the Mayor's Court and City Prosecutor's Deferred Prosecution Program violate the Equal Protection and Due Process Clauses.

    C. Enter an order enjoining Defendants from imposing fines, fees, court costs or otherwise from financially profiting from violations of the Gretna Municipal Code within the Mayor's Court;

    D. Enter an order requiring Defendants to offer participation in the Deferred Prosecution program to all accused of municipal violations, not only those that can afford to pay;

    E. Enter an order enjoining Defendants to refund all Deferred Prosecution fees from those who were terminated from the program for non-payment of fees and subsequently prosecuted;

    F. Enter an order enjoining Defendants to require meaningful hearings regarding a criminal defendant's ability to pay prior to collection of any fines, fees, costs, or imposition of penalty for any violation of Gretna Municipal Code if the Mayor's Court's unconstitutional conflict of interest has otherwise been resolved;

    G. Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

    H. Order all other relief this Court deems just and proper.

(Rec. Doc. 41, at 18).

policymaking authority. Finally, plaintiffs cite their net revenue figures (discussed above) and argue that they can establish that the revenue generated from the Mayor's Court is a substantial portion of the General Fund.

       *c. Analysis*

It appears there is no dispute that the plaintiffs have not sued the defendants in their individual capacities or for damages. It follows, then, that defendants' immunities arguments must fail. At oral argument, the defendants conceded that the plaintiffs' official capacity claims are not subject to their immunity arguments. But, they complain, the plaintiffs have already named the City of Gretna as a defendant, so they do not need to join the Mayor, the Magistrates, and the City Prosecutors even if they are only named in their official capacities. At this stage in the litigation, the court finds no benefit to dismissing the Mayor, the Magistrates, and the City Prosecutors on the ground that their inclusion is superfluous—there is no longer any burden of participating in discovery or appearing at trial as a party that would be avoided by a dismissal. Accordingly, the defendants' Motion for Summary Judgment on the basis of immunities is denied.

Defendants have also argued that they are entitled to summary judgment on plaintiffs' institutional conflict of interest Due Process claim. For the reasons discussed above, the court has found that the undisputed facts establish that there was no such Due Process violation. Accordingly, defendants' Motion for Summary Judgment on Count I is GRANTED. As to defendants' argument that plaintiffs cannot establish a policy, practice, or custom sufficient for municipal liability to attach, that issue is moot as a result of the court's resolution of the merits question of whether the Mayor's Court suffers from an institutional conflict of interest that violates Due Process.

<u>Conclusion</u>

For the foregoing reasons, plaintiffs' Motion for Partial Summary Judgment is DENIED and defendants' Motion for Summary Judgment is GRANTED as to plaintiffs' due process claims and DENIED as to defendants' immunities' arguments. Plaintiffs' Count I claim alleging financial conflict of interest in the Mayor's Court in violation of Due Process is hereby dismissed with prejudice.

New Orleans, Louisiana, this 20th day of February, 2020.

Janis van Meerveld
United States Magistrate Judge